## PHELPS v. McDONALD.

1. A., a British subject resident in this country, was duly declared a bankrupt by the proper district court, Dec. 10, 1868, and the conveyance of his estate was in the usual form made by the register to an assignee. At that time he had a claim against the United States, of which the commission organized under the treaty between the United States and Great Britain of May 8, 1871 (17 Stat. 863), took cognizance, and made an award for its payment. *Held*, that the claim passed to the assignee.

2. The statutory requirement, that all suits by or against an assignee in bankruptcy shall be brought within two years from the time the cause of action accrued, relates to suits by or against him with respect to parties other than the bankrupt.

3. Although a court of equity has not within its territorial jurisdiction the real or the personal property which is the subject-matter in controversy, it may, having the necessary parties before it, compel, by appropriate process, the performance of every act, which, if done voluntarily by them according to the *lex loci rei sitæ*, would give full effect to its decree *in persōnam*.

APPEAL from the Supreme Court of the District of Columbia. This was a bill filed Sept. 8, 1874, by Thomas J. Phelps against Augustine R. McDonald. By an amendment, William White was made a defendant. It alleges that McDonald was on his petition declared a bankrupt by the District Court of the United States for the Southern District of Ohio, Dec. 10, 1868; that Phelps was appointed assignee, and received, Feb. 12, 1869, in due form the assignment of all the bankrupt's real and personal estate; that in the schedule of assets filed by the bankrupt appears this item: "Claim against General Osborne, of U. S. Army, and others, for burning, in January and February, 1865, from one to two thousand bales of my cotton in Arkansas and Louisiana;" that this is the only description of the claim, except that in the duplicate schedule filed in the office of the register of said court the amount is stated at seven thousand to eight thousand bales, and the claim, with others, is designated as "worthless;" that McDonald, March 17, 1869, received his discharge from the court, and that thereafter Phelps, having petitioned for and obtained an order to sell certain accounts, notes, and judgments of the bankrupt, sold them at public sale, White becoming the purchaser of the uncollected accounts belonging to the estate for the sum of

twenty dollars; that the purchase was made for McDonald, with money furnished by him, and the claim transferred to him by White.

The bill further alleges, that, prior to the filing of his petition in bankruptcy, McDonald had a just and valid claim against the United States for certain cotton destroyed by the army during the late civil war; that being a British subject, although for many years a resident of this country, he prosecuted the claim before the joint British and American commission organized under the treaty of May 8, 1871, between the United States and Great Britain; that the claim was finally adjudged to be valid; and that, Sept. 25, 1873, the commission awarded the sum of $197,190 "to be paid in gold by the government of the United States to the government of her Britannic Majesty in respect of the above claim."

To the bill of complaint is annexed as an exhibit McDonald's memorial to the joint commission, which shows his claim as one arising from purchases of cotton made by him in the insurrectionary States under permits from the Secretary of the Treasury and letters from the President of the United States, and alleges the subsequent repeal of the laws authorizing such permits before he could remove the cotton, and its final destruction by the Federal army.

The complainant insisted that this claim, thus arising from an alleged breach of an obligation of the United States to protect McDonald in the possession of the cotton destroyed, is not that described in the schedule of the assets which were sold by the assignee to the defendant White, and afterwards assigned by him to McDonald; that the schedule did not describe a claim against the United States arising from a violation of permits given by the President, and that the designation of it as "worthless" added to the description given was well calculated to mislead; that the rules of the joint commission required all assignments of claims to be stated, which McDonald did not do, but prosecuted his claim upon his original title; that the award was made to him on that title, and not on that derived by purchase through White from the assignee in bankruptcy; and that said award ought rightfully to be paid to the complainant as assignee for the benefit of the creditors of said

bankrupt, whose claims, as stated in his schedule, amount to $177,380, the only sum ever realized from his estate being the twenty dollars derived from the sale to White.

The bill then alleges that McDonald assigned said award to White, " who took the same with full knowledge that said McDonald had no valid title thereto;" that the United States paid to the agent of the British government in the city of Washington said award, and he is about to pay the same to McDonald. The bill prays for an injunction restraining Mc-Donald and White, or either of them, from receiving said award, and for a decree that said fund be held in trust for the creditors of said McDonald, and be subject to the complainant's rights as assignee in bankruptcy.

Process was personally served on both defendants. They answered, and the complainant filed a replication. A temporary injunction was awarded. Subsequently, by consent of parties, a decree was made that one half of the amount of the award be received by the defendants to pay the expense of prosecuting the claim before the joint commission, and the other half placed in the hands of George W. Riggs, as receiver, to await the final action of the court; and that McDonald execute all orders, receipts, and acquittances necessary to enable the receiver to obtain the fund.

The defendants withdrew their answer and filed a demurrer, the grounds whereof are, in effect, that the court below had no jurisdiction of the case, but that the exclusive jurisdiction remained with the District Court of the United States for the Southern District of Ohio; that the bill was not filed within two years from the time when the cause of action accrued; that the claim against the United States did not give any right of action either to McDonald or to the complainant as his assignee in bankruptcy ; that if it did, such right was in tort, and did not pass to the assignee ; that it appears by the bill and the said treaty that no ground or right of action against the United States ever existed in favor of said assignee by virtue of the assignment in bankruptcy.

The special term of the court sustained the demurrer, and decreed that the bill be dismissed, and that the receiver pay over to the defendants the money in his hands. The com-

plainant having appealed to the general term, where the decree was affirmed, he brought the case here.

*Mr. F. P. Stanton* and *Mr. George F. Appleby* for the appellant.

An assignee in bankruptcy may sue in any court of competent jurisdiction to recover the assets of the bankrupt. *Johnson's Assignee* v. *Bishop*, 1 Woolw. 326; *Lathrop, Assignee,* v. *Drake et al.*, 91 U. S. 516; *Eyster* v. *Gaff et al.*, id. 521; *Burbank* v. *Bigelow et al.*, 92 id. 179; *Claflin* v. *Houseman, Assignee,* 93 id. 130.

The suit was not barred by the Statute of Limitations. The right of the assignee as against McDonald did not accrue until the award was made. *Clark* v. *Clark et al.*, 17 How. 315.

McDonald had at the date of his petition in bankruptcy a claim against the United States for the destruction of his cotton. Its validity is averred in the bill, and is conclusively established by the decision and award of the commission. *Comegys et al.* v. *Vasse*, 1 Pet. 193. Such a claim passes by the register's deed to the assignee in bankruptcy (Rev. Stat., sect. 5046), although it be incapable of enforcement by legal proceedings. *Comegys et al.* v. *Vasse, supra; Milnor et al.* v. *Metz*, 16 Pet. 221; *Clark* v. *Clark et al., supra; Sheppard* v. *Taylor*, 5 Pet. 707; *Frevall* v. *Bache*, 14 id. 95. Even if the fund arising from the allowance of the claim had been in England and in the hands of the British government, that fact would not defeat the jurisdiction of the court below, to which the parties were amenable, and against whom a decree could be rendered and enforced by process *in personam*. 2 Story, Eq. Jur., sect. 899 *et seq.*

*Mr. William A. Cook* and *Mr. C. C. Cole, contra.*

The assets of the bankrupt, including the claim in question, were purchased by White, who transferred it to McDonald, in whom was thus vested a perfect title as against the assignee. There having been no concealment of the condition or the supposed value of the claim, the case is not within the principle of *Clark* v *Clark et al.*, 17 How. 315.

At the time of the sale by the assignee this claim was worthless, having only a possibility of a value.

As the fund must be considered as being in England, the

interest in, or the title to, a claim thereon did not by the assignment in bankruptcy pass to the assignee. *Oakey* v. *Bennett*, 11 How. 33 ; Lawrence's Wheaton (2d ed.), pp. 162, 163 ; *Perry* v. *Barry*, 1 Cranch, C. C. 204 ; *Blaine* v. *Drummond*, 11 Brock. 62 ; *Hunt* v. *Jackson*, 6 Blatchf. 349.

The fund was under the control of the British government to be distributed, and the decree of a court in this country could not operate upon it. Treaty of 1871, art. 12 ; Story, Eq. Pl , sect. 489. Were the law otherwise, the court below could have no jurisdiction, except on the ground of fraud, trust, or contract, and neither is alleged in the bill. *Blake's Case*, 1 Cox, 393 ; *Penn* v. *Baltimore*, 1 Ves. 444 ; *Massie* v. *Watts*, 6 Cranch, 148.

MR. JUSTICE SWAYNE delivered the opinion of the court.

This is an appeal in equity from the Supreme Court of the District of Columbia. The case was decided in that court upon a demurrer to the bill and amended bill of the complainant. The demurrer was sustained and the bills were dismissed. The complainant is the appellant, and the action of the court below is brought before us for review.

The demurrer admits the facts alleged. The question is only as to their sufficiency to entitle the appellant to the relief which he seeks. Without reproducing the case in detail as it is in the record, we shall address ourselves to the salient points which it presents for our consideration.

A chose in an action lies at the foundation of the controversy. It is thus described by McDonald in the schedule of his assets filed with his petition in bankruptcy : " Claim against General Osborne, of U. S. Army, and others, for burning, in January or February, 1865, from 1,000 to 2,000 bales of my cotton in Arkansas and Louisiana."

The late bankrupt law provided that as soon as an assignee was appointed, the judge or register should convey to him " all the estate, real and personal, of the bankrupt." Rev. Stat., sect. 5044. And that there should vest in the assignee, among other things, all the bankrupt's " rights of action for property, real or personal, and for any cause of action which he had against any person arising from contract, or from the unlawful taking or detention or injury to " his property.

*Comegys et al.* v. *Vasse* (1 Pet. 195) has an important bear-
ing upon this case.   It arose under the bankrupt law of April 4,
1800.   2 Stat. 19.   The fifth and sixth sections authorized the
commissioners to convey to the assignees "all the real and
personal estate, of every nature and description, to which the
said bankrupt may be entitled, either in law or equity, in any
manner whatsoever."

Under this act Vasse was declared a bankrupt and received
his certificate of discharge.   He had been an underwriter, and
as such received from those whom he had insured and in-
demnified assignments of their claims against France, Great
Britain, and Spain.   In his return of his effects to the com-
missioners, pursuant to the statute, he named the claims
against France and England, but not the claim against Spain.
The omission was supposed to have been honestly made,
because there was then not the slightest *spes recuperandi* with
respect to that country.   The claim was regarded as hopelessly
worthless.

More than twenty years later, under a treaty between Spain
and the United States, an award was made for its payment.
There, as here, the money was demanded by the bankrupt and
by his assignees, and the same lines of argument to which we
have listened in this case were pursued by the counsel in that
case with consummate learning and ability.   The judgment of
the court was delivered by Mr. Justice Story.   It sustained
the demand in behalf of the creditors, and is exhaustive and
conclusive.

It is needless for us in this case to go over the same field of
discussion.   A few remarks, however, grounded chiefly upon
that authority will not be out of place.   It will be observed
that the claim against Spain, and the claim against the United
States, here in question, rested upon the same foundation, and
that each was surrounded by like circumstances.

There is no element of a donation in the payment ultimately
made in such cases.   Nations, no more than individuals, make
gifts of money to foreign strangers.   Nor is it material that
the claim cannot be enforced by a suit under municipal law
which authorizes such a proceeding.   In most instances the
payment of the simplest debt of the sovereign depends wholly

upon his will and pleasure. The theory of the rule is that the government is always ready and willing to pay promptly whatever is due to the creditor. It is but a short time since our government could be sued, and it can be done now only under the special circumstances defined by the statute. It is enough that the right exists when the transfer is made, no matter how remote or uncertain the time of payment. The latter does not affect the former. Nor has an adverse decision any final effect. If the demand be just, and recognized as valid by the law of nations, the claimant, or his government, if the latter choose to do so, may still press it upon the attention of the alien government.

If the thing be assigned, the right to collect the proceeds adheres to it, and travels with it whithersoever the property may go. They are inseparable. Vested rights *ad rem* and *in re* — possibilities coupled with an interest and claims growing out of property — pass to the assignee. The right to indemnity for the unjust capture or destruction of property, whether the wrong-doer be a government or an individual, is clearly within this category. *Erwin* v. *United States*, 97 U. S. 392. The register's deed in this case bears date Feb. 12, 1869. The title then became vested in the appellant. Thereupon he stood in the place of McDonald, and was clothed with all the rights which had belonged to the bankrupt before he became such. On the 25th of September, 1873, within less than five years after the assignment, an award was made by the mixed commission, sitting under the treaty between the United States and Great Britain, for the payment of $187,190 in satisfaction of the claim.

In the light of these considerations, it would be sheer fatuity to deny the substantial character and value of the claim at the time of the transfer by the register's deed.

But it is insisted that the alleged sale under the order of the District Court divested the title of the assignee.

According to the bill, the order was to sell " certain accounts, notes, judgments," &c. The exhibit referred to as containing " copies of the petition, order, and report of the sale " is not in the record. Whether the order was broad enough to include the claim in question, and whether the report showed that it

was sold, are questions which, in the state of the record as it is before us, we are unable to determine. Doubts in such cases are to be resolved against the pleader. But if the affirmative be conceded as to both these points, a fatal objection still remains. McDonald went into voluntary bankruptcy. His petition did not disclose that he was a British subject. We have given the description of the claim in the schedule filed with his petition. It was brief and vague, and gave no definite information. In a duplicate schedule filed with the register he pronounced it "worthless." In assigning to him exempted property, the register and assignee unite in saying, "No other exemptions made, because there are no assets, except some old claims which upon their face called for large amounts, and upon inquiry I find them totally or entirely worthless." He failed to make. known that he bought the cotton under a permit from the Treasury Department, accompanied with an order from the President directing the officers of the army and navy to aid him in getting it beyond the lines of the insurgent territory, and that it was lost to him by reason of a sudden and unexpected change in the legislation of Congress, thus creating as strong an equity in his favor against the United States as could well exist.

His memorial to the mixed commission was sworn to on the 25th of November, 1871. In that document his losses are stated with fulness and particularity. It is in striking contrast with the meagreness of the schedules. When there had been a transfer of the claim, the rules of the commission provided that "the mode and manner of such transfer must be stated." The memorial was silent upon this subject. This asset — soon to realize nearly $200,000 — was sold for $20! The amended bill avers, and the demurrer admits, that "the said White at the sale of assets in the bill mentioned purchased the same at the request of said McDonald, and with money furnished by him."

Such is the case touching the point in hand, as it is presented by the demurrer of the appellees to the allegations of the complainant. Considering the sale in the light of this showing, we cannot hesitate to hold it invalid. We are not unmindful that the question may come again before the lower

court, and perhaps before this court, upon the answers of the appellees and the testimony adduced by the parties, and that it may then be the hinge of the controversy. It is our purpose in such case to leave both courts unfettered by any thing in this opinion, and in all respects as free to decide, one way or the other, as if the subject had not been before considered by either tribunal.

The bankrupt law required that all suits by or against the assignee should be brought within two years from the time the cause of action accrued. Rev. Stat., p. 982, sect. 5057.

. But this provision relates to suits by or against the assignee with respect to parties other than the bankrupt. In a case like this it has no application. If this were otherwise, the cause of action here did not accrue until the award was made and McDonald set up a claim to the fund awarded. *Clark* v. *Clark*, 17 How. 315.

Lastly, it is said that the suit is in effect a suit against the British government, and that hence the court below had no jurisdiction of the case.

In *Clark* v. *Clark* (*supra*), where the contest was between the bankrupt and his assignee, touching a fund in the treasury derived from a foreign government, the Secretary, though not a party, was enjoined from paying it over until the rights of the contestants were settled in the suit then pending.

In *Millnor et al.* v. *Metz* (16 Pet. 221), also, the fund in controversy was in the treasury. The Secretary refused to recognize the claim of either party, and left them to adjust the conflict by a judicial determination. The contest was ended by a decree in the court below, which was affirmed by this court, perpetually enjoining one of the parties from receiving the money.

This objection assumes facts which have no existence. The British government is in no wise, either in form or substance, a party to the record, and no final or coercive judicial action is sought except with respect to McDonald and White. In the progress of the case below, George W. Riggs was appointed receiver, with authority to collect the fund. Of course he could do nothing without the voluntary concurrence of the just and eminent British agent, who was in possession.

By consent of parties the fund was delivered to the receiver, and in the final decree brought here for review he was directed to pay it over to the appellees, less certain charges and expenses incurred in procuring the award, and he was thereupon to be discharged from his office. We have heard no objection from any quarter to the placing of the fund in the hands of the receiver. Certainly none has been suggested in behalf of the sovereignty whose rights are said to have been invaded.

But suppose, as has been suggested, that the money were in the British exchequer, at the seat of the home government, still the court below acquired jurisdiction of the parties and of the cause, and had an important duty to perform.

Such commissions as that which made the award here in question usually decide only as to the validity of the claim and the amount to be paid. It is rarely, if ever, within their jurisdiction to decide upon the ownership of the claim. They have no means of compelling the attendance of parties or witnesses, no rules of pleading or procedure applicable to such a case, and the foreign element in the tribunal, at least, cannot be supposed to have any knowledge of the law according to which the question is to be determined. The validity of the claim depends upon the law of nations; its ownership, upon the local jurisprudence where the transfer is alleged to have been made.

Hence, *Comegys* v. *Vasse*, *Clark* v. *Clark* (*supra*), and other like cases have arisen, involving conflicting claims to the fund awarded, and nothing else.

In this case, whether the money be here or abroad, the assignee is entitled to have the question finally settled whether he or McDonald has the better right. This court has twice decided that a British subject can sue the United States in the Court of Claims, because an American citizen is permitted to sue the British government by a petition of right. The act of Congress creating the court requires reciprocity. *United States* v. *O'Keefe*, 11 Wall. 178; *Carlisle* v. *United States*, 16 id. 147.

If the claim of the assignee were presented to the British government by a petition of right, and the claim of McDonald were also presented, the parties, in the absence of any judicial

determination, would doubtless be required to settle their controversy by interpleading, or in some other appropriate form of litigation.   If the appellant shall be finally successful in this case, and the record should be presented with his petition, no such question could arise, and judgment in his favor must necessarily follow.   Conceding the fund to be there, why should not this question of paramount right be settled in this case, rather than that the American claimant should be subjected to the delay, expense, and other inconveniences of a suit before a foreign tribunal?   The adjudication would be as binding in one case as in the other.

Where the necessary parties are before a court of equity, it is immaterial that the *res* of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal.   It has the power to compel the defendant to do all things necessary, according to the *lex loci rei sitæ*, which he could do voluntarily, to give full effect to the decree against him.

Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree *in personam* according to those equities, and enforce obedience to their decrees by process *in personam*.   2 Story, Eq., sect. 899; *Miller* v. *Sherry*, 2 Wall. 249; *Penn* v. *Lord Baltimore*, 1 Ves. 444; *Mitchell* v. *Bunch*, 2 Paige (N. Y.), 606.

The decree of the court below will be reversed, and the cause remanded with directions to proceed in conformity to this opinion; and it is

*So ordered.*


Mr. Justice Miller, with whom concurred Mr. Justice Field, dissenting.

The treaty under which the award was made, which is the subject-matter of this suit, provides for the payment to Great Britain of claims for injury to British subjects, and the award in this case in express terms orders the money to be paid to the agent of that government in this country.   *Comegys* v. *Vasse* and *Clark* v. *Clark*, cited in the opinion, are cases of awards made in favor of the United States for the use of its citizens.

While the money so awarded is properly a fund within the

jurisdiction of our courts, as are also our own citizens, I do not think those courts have any control over the British government or its agents in the distribution of the fund awarded to them.

It does not appear from any thing in the record, as I read it, that the fund in controversy has ever been voluntarily paid into court by the agent of that government. It is an indelicate attempt by the courts of this country to seize *in transitu*, for its own citizens, what by treaty this government has agreed to pay to another government for its subject.