ENOS N. TAFT, SUCCESSOR TO JOHN TODD, AS ASSIGNEE IN BANKRUPTCY, ETC., RESPONDENT, *v.* FERDINAND A. MARSILY, APPELLANT, IMPLEADED WITH LOUIS ENGELHORN AND OTHERS.

*Geneva award — the distribution of the balance remaining in the treasury of the United States, under the act of congress of 1882, was a mere bounty — the right to receive the enhanced premiums paid did not pass under an assignment in ruptcy, but remained in the assignors.*

The defendants Engelhorn and Marsily, while carrying on business as copartners, paid between the months of May, 1861, and May, 1865, in the course of their business, to underwriters, sundry premiums for insurance against risk of capture and destruction of the merchandise insured, by any of the cruisers of the Confederate States of America. In June, 1882, an act of congress was passed entitled "An act to re-establish the Court of Commissioners of Alabama Claims," for the distribution of the unappropriated moneys of the Geneva award, by which the moneys paid by the said defendants for the insurance above mentioned, were made payable, in said Court of Commissioners of Alabama Claims, out of so much of the Geneva award as then remained in the treasury of the United States.

The Geneva award was paid to the United States by Great Britain pursuant to an award made by arbitrators to adjust the difference between the two countries, arising from the alleged breach of the obligations resting upon Great

Britain as a neutral power, during the late rebellion; no part of the said sum being paid on account of premiums for insurance of property against loss or capture on the high seas by so-called Confederate cruisers, but the whole sum being paid by and received from Great Britain in satisfaction for losses directly resulting from damages caused by the so-called Confederate cruisers, the government of Great Britain having refused to entertain and pay claims for premiums paid for insurance of property such as were paid by the said defendants. In pursuance of the provisions of the said act of 1882 the defendants filed their claim in said court and recovered a judgment thereon against the United States for the war premiums so paid by them.

The plaintiff brought this action to recover the said money, claiming to be entitled to receive it, as being the successor to an assignee appointed in proceedings in bankruptcy, instituted by the said defendants in August, 1867, to whom an assignment was by them duly made and executed, as provided by the laws of the United States, which purported to convey and assign all the estate, real and personal, of which they were possessed, and in which they were interested, on August 12, 1867.

*Held,* that the assignee in bankruptcy had no right to collect, as such assignee, the moneys awarded to the defendants, for war premiums paid by them, pursuant to the provisions of the act of congress of 1882.

That there being no claim existing in favor of persons paying enhanced premiums of insurance against Great Britain, which the United States could or did enforce, . there was not even a moral obligation upon our government to devote money which had been paid to them for another purpose to this object, and that the distribution of the Geneva award to those who had paid enhanced premiums of insurance was, therefore, the giving of a bounty to those who had perhaps suffered during the war, but who had no claim, either legal or equitable, upon any body for indemnification.

APPEAL from a judgment in favor of the plaintiff, entered upon the trial of this action by the court without a jury.

The defendants, Louis Engelhorn and Ferdinand A. Marsily were, on the 13th day of April, 1861, copartners in business and continued such until August, 1867. They, between the months of May, 1861, and May, 1865, in the course of their business, paid to underwriters sundry premiums for insurance against risk of capture and destruction of the merchandise insured, by any of the cruisers of the Confederate States of America.

In August, 1867, Engelhorn & Marsily duly filed their petition in bankruptcy, and such proceedings were thereupon had that the said Engelhorn & Marsily were adjudicated bankrupts and an assignee appointed, of whom the present plaintiff herein is the successor, and an assignment was duly made and executed to the said assignee in bankruptcy, as provided by the laws of the United

States in that case made and provided, which purported to convey and assign all the estate, real and personal, of the said defendants, Engelhorn & Marsily, including all the property, of whatever kind, of which they were possessed or in which they were interested or which they were entitled to have on the 12th day of August, 1867.

On or about the 8th day of May, 1871, the United States of America and the Queen of Great Britain, concluded at the city of Washington a treaty, whereby arbitrators were to be chosen to adjust the differences between the two countries arising from the alleged breach of the obligations resting upon Great Britain as a neutral power during the late rebellion in the United States, in permitting the Confederate government to fit out and harbor their cruisers in British ports. Thereafter such arbitrators were appointed and made their award known as the " Geneva Award," in favor of the United States, in pursuance of which the United States, on or about October 1, 1873, received the sum of $15,500,000, as satisfaction for the losses suffered by her citizens from the acts of said cruisers. No part of said sum was paid on account of premiums for insurance of property against loss or capture on the high seas by so called Confederate cruisers, but the whole of said sum was paid by and received from Great Britain in satisfaction for losses directly resulting from damage caused by so-called Confederate cruisers, the government of Great Britain having refused to entertain and pay claims for premiums paid for insurance of property such as were paid by the defendants Engelhorn & Marsily as above stated.

Thereafter, in the year 1874, an act of congress was passed, entitled " An act to establish the Court of Commissioners of Alabama Claims," which directed the court to receive and examine all claims resulting from damage caused by the so-called " Insurgent Cruisers," but gave no jurisdiction to receive and examine any claims for premiums paid for insurance against loss or capture on the high seas by so-called Confederate cruisers, and after the functions of the court were ended, and all claims allowed paid, there was a portion of the said $15,500,000 left unexpended.

In June, 1882, an act of congress was passed, entitled " An act re-establishing the Court of Commissioners of Alabama Claims and for

the distribution of the unappropriated moneys of the Geneva award," and by the provisions of this act the moneys paid by the defendants Engelhorn & Marsily, for premiums for insurance as above mentioned, were made payable in said Court of Commissioners of Alabama Claims out of so much of said Geneva award as then remained in the treasury of the United States.

In pursuance of the provisions of that act the said defendants, without the knowledge of the plaintiff, filed their claim in said court to recover the war premiums paid by them, and such proceedings were thereafter had on said claim, that a judgment against the United States and in favor of the defendants was rendered in April, 1884. The plaintiff brought this action claiming the right to receive said money from the United States because of the assignment in bankruptcy made as above set forth in August, 1867. The learned justice who tried this cause having decided in favor of the plaintiff; from the judgment thereupon entered this appeal is taken.

*D. M. Porter*, for the appellant.

*Henry D. Hotchkiss*, for the respondent.

VAN BRUNT, P. J. :

The single question presented for decision upon this appeal is, has the assignee in bankruptcy of the defendants Engelhorn & Marsily the right to collect as such assignee the moneys awarded to them for war premiums pursuant to the provisions of the act of congress of 1882. (Chap. 195 of 1882.)

In the consideration of this question it must be borne in mind that, in the proceedings of the United States government under the treaty of Washington, as those proceedings finally shaped themselves, the government was acting as the trustee to enforce the claims of its citizens for losses sustained because of the breach of the law of nations by Great Britain, which claims could only be enforced through its intervention, and that the money paid under the Geneva award was paid to satisfy claims of individual citizens of the United States who had suffered loss by reason of the violation by Great Britain of the law of nations, and not by way of indemnity to the United States government. There was, therefore, a moral obligation upon the part of the United States government, when it received

the amount awarded as an indemnity to its citizens for a certain class of losses, to devote the award so received to the purposes for which it was made. In fact, the government of the United States became the trustee for these parties whose claims for indemnity it had enforced. (*Gracie* v. *The New York Ins. Co.*, 8 Johns., 237; approved *Comegys* v. *Vasse*, 1 Pet., 193.) When the United States government had satisfied all these obligations there was no further duty imposed upon it, so far as its own citizens were concerned, in respect to the funds in its hands if any remained. Its duties as trustee had then terminated, and what was done by the United States with such balance was a matter of no concern to any person or government, except, perhaps, that of Great Britain.

Citizens of the United States who had paid war premiums during the rebellion occupied a very different position in respect to the obligations of its government to them, from those who had suffered losses for which the government had received compensation. In the one case no duty of reimbursement existed any more than existed in favor of those who had paid, during the war, war taxes which were largely increased undoubtedly because of the action of Great Britain, whereas, in the other, the United States government, in insisting upon indemnity, claimed to represent the losses sustained by its citizens, and such losses formed the basis of its recovery.

The respondent places his right to a recovery upon the grounds stated in an opinion given by Mr. Commissioner FRENCH one of the members of the Court of Commissioners of Alabama Claims, sustained, as it is claimed, by the authorities cited by him. A large number of authorities are cited and commented upon in the learned opinion referred to, but it seems to us that an examination of those cases demonstrated that a condition of affairs existed in each of the cases cited differing radically from the facts involved in the case at bar. Each one of these cases depended upon a claim arising out of an unjust capture.

Mr. Justice STORY, in delivering the opinion of the court in the case of *Comegys* v. *Vasse* (*supra*), says : " The right to indemnity for an unjust capture, whether against the captors or the sovereign, whether remediable in his own courts or by his own extraordinary interposition and grants upon private petition, or upon public negotiation, is a right attached to the ownership of the property itself." The

case then under discussion was one in which our government had demanded indemnity from the government of Spain because of the illegal capture of vessels and cargoes of American citizens by the latter, and this claim had been recognized by the Spanish authorities. Such indemnity had been demanded by our government as a matter of right, and as such had been granted by Spain, and hence our government became the trustee for those whose claims it had enforced by means of the treaty. The case of the *United States* v. *Hunter* (5 Mason, 62), depended upon a claim arising under the same treaty.

The case of *Milnor* v. *Metz* (16 Peters, 221,) was one in which a gauger in the service of the United States, receiving the salary allowed by law, performed extra services for which compensation was not provided, and his claim for payment therefor was, for that reason, disallowed by the accounting officers of the treasury. Congress having by special act provided for its payment, it was held that the right to payment had passed under an assignment of the claimant's estate and effects made by the claimant in compliance with the insolvent law of Pennsylvania where he resided. This case was decided upon the principle that an equitable claim which could not be enforced in law, *i. e.*, as against the government of the United States or a foreign government, but existing at the time of the assignment and afterwards realized, passes to the assignee.

The case of *Phelps* v. *McDonald* (99 U. S., 298), was one in which a claim existed against the United States, of which the commission organized under the treaty between the United States and Great Britain of May, 1871, took cognizance, and for the payment of which an award had been made.

In the case of *Leonard* v. *Nye* (125 Mass., 455), the claim, which was held to have passed by assignment, was one of those embraced within the provisions of the award and arose out of an unjust capture.

In the case of *Bachman* v. *Lawson* (109 U. S., 659), the claim also was one arising from an unjust capture. Each and every one of the foregoing cases depended for its decision upon the principle that the claim was founded upon the law of nations, according to which a foreign government is bound to indemnify against unjust capture, and it was the recognition of this law which formed the basis of the Geneva award.

It may be true that remuneration cannot be recovered against the foreign government by action at law, but if justice be not done, the government of the injured citizen, in the exercise of its discretion, will protect and enforce his rights, a duty which the government of the United States attempted to fulfill by the treaty of Washington towards its citizens who had been injured by the violation of the law of nations by Great Britain. The cases cited, therefore, have no bearing upon the question now before us for decision.

In the case at bar it is not pretended that under the law of nations any person who paid war premiums had any claim against the foreign government as in the case of capture. Indeed, the unanimous decision of the Geneva tribunal was hostile to this view, and it was expressly held that such claims presented no demand which was recognized by the law of nations, and they were accordingly entirely excluded from consideration by that tribunal. Those persons, therefore, who had paid enhanced premiums of insurance, had no claim against the foreign government, such as exists and is recognized by the law of nations in the case of unjust capture.

One important point, which must not be lost sight of in the consideration of this question, is the fact that even in the case of an unjust capture, the claim of the party injured is not primarily against his own government, but against the foreign government which has, in violation of the law of nations, inflicted the damage; and the government of the party injured is only the agent through which the demand is enforced, and a claim arises against it only when collection has been made from the offending foreign government.

Because of enhanced premiums of insurance paid, no claim arises, as we have seen, against the foreign government, the party paying has no demand to be enforced, and if any payment were made on that account by the offending foreign govenment, it would be a mere donation, having no foundation in right. It is undoubtedly true, that if the government of Great Britain had made a payment to our government out of good will, because of claims for enhanced premiums of insurance, that upon the receipt of that money a moral obligation would have rested upon our government to distribute such fund amongst those who came within the class; but there being no claim existing in favor of these parties against

the foreign government which our own government could or did enforce, there was not even a moral obligation upon our government to devote money which had been paid to them for one purpose, to another object.

In its whole course against Great Britain, the government of the United States was enforcing rights recognized to exist under the law of nations, and all that was allowed was indemnity for the violation of those rights. The distribution of the surplus of the Geneva award to those who had paid enhanced premiums of insurance was, therefore, the giving of a mere bounty to those who had, perhaps, suffered during the war, but who had no claim, either legal or equitable, upon anybody for indemnification. To hold that such a claim upon the charitable consideration of the government could pass by assignment would make it necessary for us to decide that a pension, granted upon the ground of disabilities incurred in the military service, would pass by assignment made subsequent to the rendition of the services, and before the right to a pension had been given by the government.

It seems to have been assumed by the learned commissioner that the case of *Emerson's Heirs* v. *Hall* (13 Peters, 410) is seemingly in conflict with the cases cited by him. Upon examination we fail to find any such seeming conflict. The case certainly is in conflict with the conclusion reached by the learned commissioner, but the cases cited to support that conclusion proceed upon facts essentially different from those before the court in the cases which were then and are now under consideration. In the case of *Erwin* v. *The United States* (97 U. S., 392) it was held that there was a claim against the government and that it passed to the assignee. In the case at bar there is no claim against anybody because of the alleged wrong done and consequently there was nothing upon which the assignment could act.

The judgment appealed from must, therefore, be reversed and new trial ordered with costs to the appellant to abide the event.

DANIELS and BARTLETT, JJ., concurred.

Judgment reversed and new trials ordered, with costs to the appellant, to abide event.