# Newman *v.* Shreve, Appellant.

*Equity—Jurisdiction over parties—Equitable relief.*

1. Where a court has jurisdiction of the person of a defendant it may render any appropriate decree acting directly upon the person, although the subject-matter may be without the jurisdiction.

2. When the court has jurisdiction over the subject-matter or the person of a principal defendant, the rule prevailing generally in judicial proceedings applies in suits in equity.

3. When a bill for an accounting of the proceeds of a sale of real estate in New Jersey is filed against five defendants, two of whom are treated as principals both in the averments of the bill and in the prayers for relief, one as an active trustee and the other as trustee ex maleficio, and the active trustee is properly served as a resident of the jurisdiction and the alleged trustee ex maleficio, a resident of New Jersey, is served as authorized and directed by the act of 1859, and causes a general appearance to be entered for him and in his answer sets up a general defense on the merits, while the other three defendants voluntarily appear, accept service and file answers, and all of the defendants are in some way interested in the property sold, or in the proceeds arising from the sale of it, or as mortgagor or mortgagee, or otherwise, the parties are all within the jurisdiction of the court for every purpose of the case and should be so treated, and it is error for the court to refuse to consider important matters bearing upon the relations and equities existing between the active trustee and the other defendants, and dismiss the bill as to all except the active trustee on the ground that the others are nonresidents and not amenable to the processes of the court.

4. While the fact that a trustee was misled, or imposed upon, or misinformed, or that by reason of impaired health and bodily infirmities he failed to exercise the careful diligence he otherwise would have done may not excuse him for failure to secure the largest price possible for the sale of the trust property, these things do appeal to the conscience of a chancellor in determining not only his legal liability but the equities that may exist between all the parties connected with the transaction.

Argued May 18, 1910. Appeal, No. 154, Jan. T., 1910, by Benjamin D. Shreve, from decree of C. P. Chester Co., in Equity, No. 513, sustaining bill against Benjamin D. Shreve in case of John S. Newman, Executor and Trustee of William Keinath, deceased, *v.* Benjamin D. Shreve, Isaac

A. Braddock, Joseph Taylor, St. Albans Realty Company, and the Sea Haven Company. Before FELL, C. J., BROWN, MESTREZAT, ELKIN and MOSCHZISKER, JJ. Reversed.

Bill for an accounting, etc. Before BUTLER, J.

The findings of fact of the lower court were as follows:

On August 2, 1881, Edward P. Carpenter executed and delivered to Henry W. Town a bond and mortgage to secure the payment of $3,000 with interest, within two years, which mortgage covered a tract of land on the ocean, situate in Little Egg Harbor township, Burlington county (now the township of Long Beach, county of Ocean), in the state of New Jersey. This mortgage was duly recorded. Default having been made in payment, foreclosure proceedings were instituted, a decree was made and an execution was directed to issue, when on June 17, 1889, the bond, mortgage, decree and execution process were assigned to Wm. Keinath, the plaintiff decedent. This mortgage was a first lien on the premises it described, and in a subsequent foreclosure proceeding on a second mortgage covering the same, and additional premises, it was duly determined that $5,188.58, with interest from September 12, 1894, were owing on this first mortgage.

Subsequent to the execution of the first mortgage, before recited, title to the land bound by it, and other contiguous territory, became vested in the Sea Haven Improvement Company, a New Jersey corporation, and this company executed to Benj. D. Shreve, one of the defendants, and Cyrus Borgner, as trustee, a mortgage upon said lands to secure an issue of bonds of $100 each, aggregating $20,000. Of these bonds Wm. Keinath was the owner and holder of fourteen, and Isaac A. Braddock, another defendant, was the owner and holder of twenty-six which on January 3, 1891, he assigned and delivered to J. E. Roberts as collateral security for money loaned. We find that the legal title to those bonds has remained in Braddock, that he owns them subject only to their pledge to Roberts as collateral for his claim against Braddock. Braddock in-

timates that on a settlement it might be found that he is no longer indebted to Roberts, and might by suit obtain the bonds.

In so far as we can discover from the evidence, the second mortgage covered the southern portion of Long Beach, a tract about four miles in length, containing, roughly speaking, from 800 to 900 acres, and the first mortgage was confined to about one-half of this tract.

Default having been made in payments due on bonds secured by the second mortgage, foreclosure proceedings were instituted on behalf of bondholders, a decree of sale was entered and David J. Pancoast, special master in chancery, was authorized to make sale of the mortgaged premises.

Subsequent to the execution of the mortgage referred to, the second mortgage, two judgments aggregating about $3,700, were recovered against the Sea Haven Improvement Company and by their owner, Levis, were later on assigned to Isaac A. Braddock.

On May 16, 1895, Wm. Keinath, the holder and owner of the first mortgage lien, together with holders of eighty-five bonds secured by the second mortgage lien, entered into an agreement with Benj. D. Shreve, authorizing him to purchase the lands at the foreclosure sale.

This agreement was executed by Keinath as the owner of the first mortgage lien and of fourteen bonds secured by the second mortgage, and was executed by Isaac A. Braddock as the owner of twenty-six bonds.

The agreement provided that in the event of Shreve acquiring title as contemplated, he should sell the same for such sum as he might deem it for the best interest of the parties, deduct from the purchase money the costs and expenses of the trust, including commissions, the costs and expenses of the foreclosure, pay the Wm. Keinath first mortgage, with interest to date of settlement, and the balance, if any, to the holders of the bonds, pro rata.

In due course, in the manner contemplated, and subject to the agreement just recited, Shreve on August 1, 1895,

was invested with title to all the lands in which Keinath was interested as holder of the first mortgage, and in which Shreve and Borgner, as trustees, were interested under the second mortgage. Whether the Levis judgments covered some accretions at the southern end of Long Branch, not included in the land described in the second mortgage as is claimed by the defendants to be a fact, and denied by the plaintiff, we cannot with certainty decide.

The description in the second mortgage is by courses and distances, and no call for the water appears. If, however, the property as described, in fact reached the water, left no intervening land, the accretions belonged to the title covered by the mortgage, though there is no express call for the water. Whether where the accretions in question are located, the mortgage title as a fact reached the water, was not shown.

However this may be, we have no hesitation in stating that to us the evidence is very convincing that no one had a thought that these judgments were a lien on anything outside of the mortgaged property, had any substantial value. Apparently Levis owned them when the agreement was made under which Shreve was to take title and protect all interests. No claim for consideration on account of these judgments was then made. Whether Braddock gave anything substantial for them does not appear, but certain it is, in so far as the evidence discloses, he never made any claim to anyone that the judgments were substantially valuable, that they covered land outside of the mortgage, and were desirable as a means of securing title thereto, until at the hearing of this case he ascribed such virtue to these judgments as a justification for having diverted to himself more than half of the consideration named in a contract of sale of the title held by Shreve. Shreve certainly never understood that there was any pretense on Braddock's part that through his judgments he controlled valuable, independent territory, shutting Shreve's title off from the

water. Shreve was constantly in communication with
Braddock relative to the seashore property, had full
opportunity to know what his interests were there, and
according to his testimony, the only property or interests
that Braddock had, or spoke of having, were so-called
hotel property and lots, wholly apart of any of the real
estate here involved. After Shreve acquired title pur-
suant to the agreement referred to, he made earnest and
continuous efforts to sell the property, urging Braddock
and others to assist him. He incurred expenses in en-
deavoring to make sale, paid taxes, etc., and no revenues
arose from the property. Braddock viewed himself as an
agent of Shreve to make sale of the property, he so testi-
fied: "I considered myself his agent to sell his interests in
the property. I have a number of letters to that effect."

"Q. Had Mr. Shreve authorized you at any time to sell
his property as his agent? A. Oh, a number of times,
yes; over ten years he had authorized me to sell it.
Q. Did you tell him you sold it as his agent? A. No, I
think not. Q. And for $33,000? A. I was buying the
property then, the moment he signed that agreement he
sold it to me, I was no longer his agent. I was acting for
myself." Having recently received a letter from Shreve,
under date April 24, 1906, authorizing him to make a sale
upon specified terms, and to secure the execution of an
agreement, late in April of 1906, Braddock came in contact
with Joseph Taylor, one of the defendants, and repre-
senting himself as Shreve's agent sought to have him
purchase. Braddock, Taylor, and his counsel, Darnell,
visited the property, looked it over, and on April 30,
1906, met at Darnell's office, the contract of sale was
written, was executed by Braddock as agent from Shreve,
by Taylor as purchaser and was also signed by Braddock
individually, he having stipulated in the contract, that
he would remove or assign any judgment or incumbrance
he might have against the property. As already stated,
we are unable to determine positively whether Braddock's
judgments had any value, but we are clear that his conduct

was wholly inconsistent with their possessing substantial value, with their being liens on property outside of that held by Shreve; and we are satisfied that there was no thought on anyone's part that through these judgments Taylor was to acquire any land. Braddock does not claim that either when viewing the property or later when the agreement was made, he suggested anything of this kind; he, as agent for Shreve, is the only party vendor named, Shreve's title as derived from the special master in chancery, is the only thing sold, and the $33,000 purchase money is an entire, indivisible consideration for that title. Even if the judgments had value, they figured in the agreement simply because Darnell viewed them as a cloud on the property Shreve was selling, and Braddock was willing to give them up in order to effectuate the sale of the Shreve title. Braddock was vitally interested in the sale being consummated, not only on account of commissions which he could well have demanded, but also as the owner of bonds secured by the second mortgage, and of certain lots, etc., that might become marketable through the sale of the Shreve land. In no aspect of the case could Braddock be viewed as entitled to any part of the $33,000 consideration on account of his judgments; if possible, his claim to part of the $33,000 is made more preposterous by the magnitude of the share claimed. Though according to his own contention his judgments covered only about 150 acres and Shreve's title covered some 800, part of which, at least, extended to the water, he sought to justify the diversion to himself of more than half of the $33,000.

The agreement of sale provided for the payment of $1.00 down, $993 on May 5, following, $5,000 cash and a mortgage for $27,000 upon the execution and delivery of the deed, conveyance to be made within ninety days from the date of the agreement.

Shreve had no knowledge of Taylor as a purchaser, before or at the time of the execution of the contract of April 30, 1906.

On May 5, 1906, Taylor, through his counsel Darnell, paid the $1,000 provided for in the contract, by two checks, one to the order of Shreve for $750, and the other to the order of Isaac A. Braddock for $250. The Shreve check was certified by the bank on which it was drawn, on May 7, 1906, and was delivered by Braddock to Shreve, on that day, on account of a contract then entered into between them, whereby Shreve agreed to convey the lands held by him to Braddock, on or before July 30, 1906, for $15,000, of which sum $750 was to be paid in cash on the execution of the agreement, $4,250 in cash on July 30, 1906, together with a purchase money bond and mortgage for the balance. This was the first and only contract of sale between Shreve and Braddock, disclosed by the evidence. While Braddock does in answering to leading questions of his counsel, say that he contracted to buy the property before he made, as Shreve's agent, the sale to Taylor, such is clearly not the fact. He testifies positively that his alleged prior contract of purchase is to be found in certain letters of Shreve written to him, two in January and one on April 24, 1906. On inspection it is seen that none of these letters exhibit a contract, and the last one, April 24, 1906, written only five days before he as agent for Shreve, contracted to sell to Taylor, wholly negatives the existence of a contract of sale to Braddock or to anyone else, for it urges Braddock to find a purchaser and to have him sign a contract. Indeed, Braddock testifies that pursuant to this letter of April 24, 1906, he became active and consummated the sale to Taylor a few days later. Moreover, Braddock's testimony relative to what he told Shreve, concerning the Taylor contract, on May 7, 1906, when he secured an agreement of sale to himself at $15,000, contains an admission that then for the first time he became a purchaser, that until then he had been Shreve's agent to make a sale. "Q. Did you tell him you sold it as his agent? A. No, I think not. Q. And for $33,000? A. I was buying the property then, the moment he signed that agreement, he sold it to me,

and I was no longer his agent. I was acting for myself. Q. Before he signed it, you were representing yourself as his agent? A. I was his agent to sell his property. Q. Before you got home to execute an agreement in your favor did you tell him you had already sold it for him as his agent, and received down money, for $33,000? A. I do not remember telling him anything of the kind, I do not think I did."

We are not prepared to find that at this time Braddock told Shreve of the existing contract of sale with Taylor. He says he did, but in this Shreve contradicts him, and it is improbable that Braddock would so inform him at a time when he was seeking a contract of sale to himself at less than half the price secured by the Taylor contract.

After the execution of the Taylor contract, of April 30, 1906, Darnell with a view to its performance, prepared the deed for execution by Shreve to Taylor, and the $27,000 mortgage, provided for in the contract, to be given by Taylor to Shreve, and on July 30, 1906, Taylor, Darnell, Shreve and Braddock met by appointment at Shreve's office in Camden, N. J. At this meeting we are constrained to find from the strong preponderance of the evidence, that it was clearly and distinctly announced to Shreve that Taylor had contracted with him through Braddock, acting as his agent, to buy the property held by him, Shreve, and had agreed to pay therefor $33,000, that a mortgage in Shreve's favor for $27,000 as provided by the contract, would forthwith be executed by Taylor, and that Taylor was prepared to pay the full consideration of $33,000. Darnell testifies to all of this and Taylor to part of it, and starting out with the uncontroverted facts that Taylor had a contract for the purchase of the property which he was very anxious to have carried out, that he and Darnell knew no one as the vendor but Shreve, and in going to his office to meet him, could have been actuated by no other thought than that they must there deal with him, how can it be doubted that, as they say, the $27,000 mortgage, and the deed,

were presented to Shreve, and that he did not receive $33,000 for the property simply because he inexcusably failed for some reason to appreciate his opportunity, turned it off without any consideration, and insisted on putting through his $15,000 contract with Braddock.

Darnell and Taylor testify that when it became apparent that Shreve would not accept the $27,000 mortgage, said it was drawn for too large a sum, and refused to carry out the $33,000 contract, Taylor in the presence and hearing of Shreve, said that he had contracted to pay $33,000 for the property and owed it to some one. The fact that Taylor did substantially pay this sum, leaves little room for doubting that he was fully determined to pay it, and made the fact known as he and Darnell testify. Braddock testifies that he took no part in the discussion, heard nothing of what transpired, that he left all to Shreve and Darnell, that Shreve told him to execute an assignment to Taylor, of his, Braddock's, $15,000 contract. Darnell testifies that when the $27,000 mortgage and the deed were handed to Shreve, and he refused to accept the mortgage and execute the deed because, as he stated, the amount of the mortgage was too large, he, Darnell, was much surprised, and produced the $33,000 contract to Shreve who, thereupon, refused to consider it and insisted on consummating his $15,000 contract with Braddock.

Apparently Braddock made no move toward preventing the Taylor contract being carried out; certainly Taylor was ready and anxious for its consummation; clearly on arriving at Shreve's office, Taylor and Darnell looked to him alone as the other party to their contract, and the conclusion is irresistible that they vigorously sought to carry it out with him, and that he for some wholly inexcusable reason prevented its consummation. Shreve denies that the $33,000 contract with Taylor, was brought to his attention, and in view of his reputation as a man of intelligence and integrity his denial is entitled to earnest consideration.

On the other hand, however, the testimony of Taylor.

and Darnell is convincing, not only because they stand before us as entirely reputable people, with no apparent motive to pervert the truth, but also because the situation as it existed, made notice to Shreve of the $33,000 contract, substantially in the manner they say he received notice, inevitable. As weakening the force of Shreve's denial and indicating that his mind was so wholly engrossed by his $15,000 contract with Braddock that he was unable to contemplate or consider any other contract or any other figure than $15,000 is his testimony on page 33 of the transcript of his testimony: "Q. Give the date? A. Thirtieth of July, 1906. Q. Was the first you met Mr. Taylor? A. That was the first time I met Mr. Taylor. Prior to that the deed which was to be drawn up, had been submitted to me. I think I had it out here. I sent that back again. I went there fully prepared to carry out the whole transaction. When I got there, I looked over the deed, and it was all right. The deed was for the consideration of $15,000, and it was all perfectly right in every respect as far as I observe." Clearly he must be mistaken in his statement that on July 30 at his office in Camden, he looked over the deed and saw that it was for the consideration of $15,000. Darnell, who drew this deed, prepared it with a view to consummating the $33,000 contract of sale to Taylor. There is no reason to believe that he had any knowledge of a $15,000 sale, and, therefore, obviously the deed did not state a consideration of $15,000 as Shreve testifies. All of the proof is to the effect that the deed presented to Shreve on July 30, 1906, is the one that was used by him in making title to Taylor, and the consideration therein stated is not $15,000, but is "one dollar and other valuable considerations." Shreve is positive that he executed the deed on July 30, and not on August 2, as indicated by the deed, because he is sure that he was not in Camden on the latter date. It is quite clear, however, that the deed was not executed in Camden, but out where Shreve was living in Pennsylvania.

On August 2, 1906, the date to which adjournment was had on July 30, 1906, the deed executed by Shreve and naming the consideration stated, was delivered to Taylor, he executing and delivering to Shreve, a purchase money mortgage for $11,000 and paying him $3,000 in cash. Certain cash payments were made to Braddock in addition to money he had already received, and on August 12, 1906, a mortgage was executed and delivered to him by Taylor for $12,052.78 and Taylor fully met and satisfied his obligation to pay $33,000 consideration, in cash paid, and the two mortgages given to Shreve and Braddock respectively. Subsequently Taylor conveyed the property to the Sea Haven Improvement Company, which company made conveyance to the St. Albans Realty Company, the latter executing to the Sea Haven Improvement Company a mortgage for $95,000 to secure a part of the purchase money. To make this mortgage a first lien, Braddock satisfied his mortgage given by Taylor, upon which $2,500 were still due, and to secure the payment thereof, took an assignment of the $95,000 mortgage as collateral.

Wm. Keinath died May 14, 1898, in the city of Philadelphia, testate, and letters testamentary were duly granted to John S. Newman, the plaintiff, on May 20, 1898. On March 18, 1908, the plaintiff met Shreve at his home at Devon in this county, for the purpose of effecting a settlement respecting the proceeds of the sale of the property. At that time the plaintiff did not know the price paid by Taylor, but understood that the land had been properly disposed of for $15,000. He had no knowledge of the sale to Taylor for $33,000 until early in 1909, when the information was incidentally given him by Darnell. After deducting costs, expenses, fees, taxes, etc., from the $15,000 received, a balance of $3,029.69 remained, which Shreve paid to the plaintiff, there being due at the time, March 18, 1908, to the Keinath estate, $5,188.58, with interest from September 12, 1896, on the first mortgage and principal and interest on fourteen $100 bonds secured by the second mortgage.

The decree of the court was as follows:

"The bill is dismissed as to all of the defendants excepting Benjamin D. Shreve. He having received and accounted for the sum of $15,000, purchase money, is directed to account to the parties in interest for the further sum of $18,000, as if he had received $33,000 for the trust estate confided to him."

The court, on exceptions, subsequently modified its decree which reads as follows: "The bill is dismissed as to all of the defendants excepting Benjamin D. Shreve. He having received and accounted for the sum of $15,000 purchase money, is directed to account to the plaintiff for the further sum of $18,000, as if he had received $33,000 for the trust estate confided to his care, but in the event that the balance in his hands on a proper accounting is in excess of the amount due plaintiff on his mortgage and bonds, he shall be required to pay over only an amount sufficient to cover the sum due the plaintiff."

*Error assigned* was the decree of the court.

*John G. Johnson,* with him *Wm. M. Hayes, Thomas E. French* and *J. Carroll Hayes,* for appellant.—The burden is on the plaintiff to prove the authority of an agent on whose act he relies to charge the principal: American Car, etc., Co. v. Water Co., 221 Pa. 529.

Trustees are liable to a surcharge only where they are guilty of fraud, or supine negligence equivalent to fraud: Springer's Est., 51 Pa. 342; Semple's Est., 189 Pa. 385; Pleasonton's App., 99 Pa. 362; Waddell's Est., 196 Pa. 294; Greenwood's App., 92 Pa. 181; Bartol's Est., 182 Pa. 407.

*J. Frank E. Hause,* with him *William E. McCall, Jr.,* for appellee.—The decree of the court was fully sustained by the evidence and should be affirmed: Byers v. Byers, 208 Pa. 23; Snyder v. Smyth, 224 Pa. 36; Luther v. Luther, 226 Pa. 144; Gundaker v. Ehrgott, 209 Pa. 284.

OPINION BY MR. JUSTICE ELKIN, July 1, 1910:

As we view this record the learned court below erred in dismissing the bill as to all the defendants except appellant. The bill was filed against five defendants, two of whom, Shreve and Braddock, were treated as principals both in the averments of the bill and in the prayers for relief, and the other three were included because connected with the transaction about which complaint is made. The bill was dismissed as to all the defendants except Shreve upon whose shoulders the whole burden was cast without even extending relief to the extent of the unpaid purchase money, which, it is conceded, he never received, and to which relief he was clearly entitled if within the power of the court to grant. Braddock was a resident of the state of New Jersey in which was located the land out of which this controversy arose. Shreve, trustee for the bondholders, and as such a principal defendant, was a resident of Chester county, Pennsylvania, at the time the bill was filed, and being properly served, was within the jurisdiction of the court. Braddock, being a nonresident, was served as authorized and directed by the act of 1859. He caused a general appearance to be entered for him and in his answer set up a general defense upon the merits. The other three defendants voluntarily appeared, accepted service and filed answers. All of the defendants were in some way interested in the property sold, or in the proceeds arising from the sale of it, or as mortgagor or mortgagee, or otherwise. It was a situation calling for the exercise of the equity powers of a court in such manner as to work out equitable and just results between the parties in so far as it could be done under the circumstances. Shreve was the active trustee and the bill was filed against him as such, but Braddock was also charged as being a trustee ex maleficio, and as such with having received moneys for which he had not accounted. As to the conduct of Braddock the court did not inquire and no finding was made as to his being a trustee ex maleficio, although this was

one of the principal averments of the bill.  In the fifth paragraph of his answer, Braddock sets up that he only assumed to act as agent for Shreve in the agreement with Taylor for the purpose of securing the payment to Shreve as trustee of $15,000, which was the amount the latter had agreed to accept for the land in question, and the balance of the purchase money agreed to be paid by Taylor did not belong to Shreve as trustee, but was due him, Braddock, as a party in interest.  These were important matters bearing upon the relations and equities existing between Shreve and Braddock and upon their resultant liability to the bondholders or to each other.  These things were not considered by the court in any conclusive way because the bill was dismissed as to Braddock and the other three defendants.  This led to error in another respect, that is, not to fully consider the terms and conditions upon which the sale for $33,000 was made.  Enough appears in the record here presented to show that Shreve only received $15,000 out of the entire purchase money, and that Braddock did not receive nearly all of the remaining $18,000.  Whether he paid a commission for making the sale, what became of the money unaccounted for, why he did not receive the entire balance, and how all these things affected the equities and legal liabilities of the principal party or parties were not given that consideration in the determination of the questions involved which the facts warranted and the case demanded.  No doubt this was due to the fact that the court did not consider Braddock and the other defendants within its jurisdiction for the purpose of entering a final decree against them or any of them.  No one can read this record without being convinced that Shreve was misled, or imposed upon, or misinformed, or that by reason of impaired health and bodily infirmities he failed to exercise that careful diligence he otherwise would have done.  While these things may not excuse him for failure to secure the largest price possible for the sale of the trust property, they do appeal

to the conscience of a chancellor in determining not only his legal liability, but the equities that may exist between all the parties connected with this transaction. Then, again, it is admitted that at the time of the hearing $2,500 of the original purchase money was unpaid, and if Shreve is to be held for the entire purchase price agreed to be paid by Taylor, he is clearly entitled to have some decree entered by the court in reference to the payment of this unpaid balance as a protection to him. All of the parties were before the court, and we can see no reason why these matters should not have been considered and such decree made in reference thereto as to equity and justice doth appertain.

The bill was dismissed as to Braddock and the other defendants on the ground that they were nonresidents and not within the jurisdiction of the court or amenable to its processes. The general rule is that when a court has jurisdiction of the person of a defendant it may render any appropriate decree acting directly upon the person, although the subject-matter may be without the jurisdiction. When the court has jurisdiction over the subject-matter, or the person of a principal defendant, the rule prevailing generally in judicial proceedings applies to suits in equity. Objections to jurisdiction over the parties are waived by appearing on the merits. An answer to the merits waives an objection contained in the same answer that the defendant is a nonresident: Mutual Aid Association v. Richardson, 38 Ill. App. 111; Carroll v. Lee, 22 Am. Dec. 350; 16 Cyc. 120. In Phelps v. McDonald, 99 U. S. 298, it was held that where the necessary parties are before a court of equity it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the parties to do those things necessary to give effect to the decree entered against them. Without regard to the situation of the subject-matter courts consider the equities between the parties, and decree in personam according to

those equities and enforce obedience to their decree by process in personam. For a very interesting and exhaustive discussion of this question see our late case of Schmaltz v. York Mfg. Co., 204 Pa. 1. The appellant was a trustee, the bill charged Braddock with being a trustee ex maleficio, the subject-matter of the controversy was a trust estate, and the principal defendant lived in Chester county where the court had the power to compel an accounting. When the parties all appeared either voluntarily or by service regularly made or as directed by the court under the act of 1859, and entered a general appearance, filing answers on the merits, they were within the jurisdiction of the court for every purpose of the case and should have been so treated. For these reasons we think the record should be remitted so that the court and the parties may have the opportunity of considering all questions that have been or may be raised under the pleadings affecting all the parties to the controversy.

Decree reversed, bill reinstated as to all the parties and record remitted for the purpose of having all questions affecting any or all of the parties determined in accordance with the general views herein expressed and upon the facts as they shall be ascertained upon a final hearing. Costs of this appeal to be paid by appellee.