GAGE v. RIVERSIDE TRUST CO., Limited, et al.

(Circuit Court, S. D. California. April 18, 1898.)

No. 636.

1. STATUTE OF LIMITATIONS—SURRENDER OF PLEDGE—ADMISSIONS.
    A pledgor cannot compel the surrender to him of securities pledged, without paying the indebtedness, on the ground that the statute of limitations has run against it; and, further, he will be estopped from setting up the statute where, in his complaint in an action between the parties, he has admitted and alleged the indebtedness.

2. RESTRAINING ACTION IN FOREIGN COUNTRY—RES.
    The court which first acquired jurisdiction of a cause and of the parties thereto will hold and maintain it, in order to end and settle the controversy; and, although the courts of one country are without authority to stay proceedings in the courts of another, they may, where the parties are residents of their countries, enjoin them from proceeding further, even where the res of the controversy may be in the foreign territory.

3. SAME.
    Where an action has been commenced and is at issue in this country, between its citizens, and while the plaintiff is temporarily in England an action is commenced against him there by the defendants, involving questions that can be adjudicated under the pleadings in the action commenced here, an injunction will be granted restraining the defendants from proceeding further in the foreign action.

Collier & Evans and W. J. Hunsaker, for complainant.
Fox, Kellogg & Gray, for defendants.

ROSS, Circuit Judge. This suit was originally commenced in the superior court of Riverside county, Cal., on the 17th day of August, 1894. Before the issuance of summons in the cause, or the appearance of either of the defendants thereto, to wit, on the 19th day of November, 1894, the plaintiff filed his amended complaint against the same defendants, namely, the Riverside Trust Company, Limited, a corporation, the Northern Counties Investment Trust, Limited, a corporation, and three fictitious persons,—John Doe, Richard Roe, and Jane Doe. The suit grows out of two certain agreements,—the first made December 13, 1889, between the plaintiff, Gage, and one Wilson Crewdson, of England, and the other of September 23, 1891, between the plaintiff, Gage, and the Northern Counties Investment Trust, Limited,—both of which agreements are annexed to, and made a part of, the amended complaint, and contain a specific description of the property involved in the suit. At the time of the execution of the agreement of December 13, 1889, the county of Riverside, Cal., had not been created. The lands, waters, and water rights constituting

the subject-matter of that agreement were then within the boundaries of San Bernardino county, Cal.

In and by the amended complaint the plaintiff alleges that the defendant the Riverside Trust Company, Limited (hereinafter referred to as the "Trust Company"), was duly incorporated and organized under the laws of the kingdom of Great Britain and Ireland, and has an office and an agent in the city of Riverside, county of Riverside, state of California, where it is conducting an extensive business, and is the owner and holder of a large amount of real property; that the defendant the Northern Counties Investment Trust, Limited (hereinafter referred to as the "Investment Company"), is a corporation organized and existing under the laws of the kingdom of Great Britain and Ireland, and is conducting business in the state of California; that the defendants John Doe, Richard Roe, and Jane Doe, whose true names are to the plaintiff unknown, claim to have some interest in the property constituting the subject of the suit, which interest, if any, the plaintiff alleges, is inferior and subject to his claim. It is alleged that on or about the 13th day of December, 1889, the plaintiff was the owner, possessed of, and entitled to the property already referred to, and which is specifically described in the complaint, at which time the projectors of the Trust Company had in progress the formation of that corporation, for and on behalf of which Crewdson entered into the contract with the plaintiff; that pursuant to that agreement, and in accordance with its terms, the plaintiff did on or about March 11, 1890, convey, by good and sufficient deed, all the property mentioned, to the defendant Trust Company, and did in every other respect comply with his part of that agreement; that pursuant thereto 900 B shares of the stock of the company were allotted and set apart to Crewdson and one Waterhouse for and on account of the plaintiff, and that the plaintiff, subject to the conditions afterwards stated, is now the owner of and entitled to those shares, save and except 18 thereof sold and transferred by the plaintiff to the defendant Investment Company; that upon the organization of the Trust Company the plaintiff subscribed and paid for, and there were issued to him, 600 A shares of the stock of the Trust Company, each of which was of the face value of £50; that by the terms of the articles of incorporation of the Trust Company, and of the agreement of December 13, 1889, said 600 A shares of stock were preferred shares, and there was guarantied on the same by the Trust Company an accumulated dividend of 6 per cent. per annum upon the amount paid up by the holders of such shares; that there was paid up on said 600 A shares by this plaintiff 50 per cent. of the face value thereof (that is to say, £25 on each of said 600 A shares), and that by the terms of the said agreement the Trust Company further agreed to pay to the plaintiff, in consideration of the conveyance of the property mentioned, the sum of £38,000, and interest at 6 per cent. per annum, compounded annually, if not so paid; that by the terms of the organization of the Trust Company, and of the agreement of December 13, 1889, said 900 B shares of the stock of the Trust Company, after making payment of 6 per cent. per annum upon the amount paid up upon all of the said A shares of stock actually issued, and after the payment to the plaintiff of the sum of

£38,000 as provided for, entitled the plaintiff at the end of each year to three-fifths of all the net profits of the Trust Company accruing out of, and resulting from, the business carried on under and by virtue of its articles of incorporation, and of the agreement of December 13, 1889; that the sum of £38,000 was to bear interest at the rate of 6 per cent. per annum from January 1, 1890, payable annually, and that if the same was earned, and was not so paid annually, it was to be compounded at the rate of 6 per cent. per annum, with yearly rests, until the same should be fully paid and satisfied; that the sum of £38,000 was to be paid to the plaintiff by the Trust Company in the following manner, to wit: That, by the terms of the articles of incorporation of the Trust Company, that company was engaged in developing, improving, and selling land and water, and other property, and by the terms of the contract of December 13, 1889, it was agreed that at the end of each year, and after payment of the current and management expenses of carrying on the business, and the payment of interest on borrowed money, and dividends upon all of the A shares of stock outstanding, and any dividends which might have accumulated on the same, and which had not been paid at maturity, the surplus profits of the Trust Company should be paid to the plaintiff, towards the liquidation of the said sum of £38,000, and interest thereon which might have accrued, and which might have remained unpaid, and that three-fifths of any profit over and above such payments should be paid to plaintiff on his 900 B shares of stock of the Trust Company; that no greater sum than £2,000 has ever been paid to the plaintiff upon the said £38,000, which said sum of £2,000 was paid on or about the ——— day of August, 1891, and that no interest has ever been paid on said sum of £38,000, except interest to March 31, 1891. It is alleged that the whole amount of said £38,000, except the payments last mentioned, remains due and unpaid, together with interest thereon at the rate provided for from March 31, 1891, compounded, with yearly rests.

It is alleged that during the period elapsing between January 1, 1890, and March 31, 1891, there was left of profit, after the payment of all current and management expenses, and interest on borrowed money, and all dividends or accumulated dividends due on March 31, 1891, in the hands of the Trust Company, which had accumulated during that period, the sum of $250,000; that an adjustment of the business transacted by the Trust Company was made on March 31, 1891, and an account taken and stated, from which there appeared to be, and were, in the hands of the defendant Trust Company, funds, properly applicable to the payment of said £38,000 and interest upon the claim and demand of the plaintiff, amply sufficient to have liquidated and paid the same in full, by reason of which the same became due and payable, together with all interest accumulated thereon, which payment the defendant Trust Company refused, and still refuses, to make, although often requested so to do; that said sum is so due the plaintiff for and in consideration and as part of the purchase money so agreed to be paid to the plaintiff in consideration of the conveyance of the property to the defendant Trust Company, to secure which the plaintiff had on March 31, 1891, and ever since has had, a vendor's lien

upon all of the said property. It is alleged that by reason of the failure and refusal of the defendant Trust Company to pay the plaintiff the said sum of £38,000 in accordance with the contract of December 13, 1889, it became and was necessary for the plaintiff, in order to meet certain obligations of his, to secure a loan of £18,000, which he did on or about September 23, 1891, from the defendant Investment Company; that, at the date of the plaintiff's application to the Investment Company for such loan, he had reason to believe that the Investment Company would deal fairly and justly with the plaintiff, and would in good faith collect from, and require the defendant Trust Company to pay, for the purpose of liquidating any money borrowed from it by the plaintiff, the sum of £38,000 then due the plaintiff from the Trust Company; that on the said 23d day of September, 1891, the plaintiff entered into a contract in writing with the Investment Company, which upon its face recited that it was to be read as supplemental to the aforesaid agreement of December 13, 1889, and by which the plaintiff assigned and transferred to the Investment Company his interest in and under the contract of December 13, 1889, together with the A and B shares of stock therein and hereinbefore specified, as security for the loan to the plaintiff of £18,000, with interest as therein stated, all of which have ever since been so held by the Investment Company. It is alleged that the Trust and Investment Companies have, since that transfer by the plaintiff to the Investment Company, conspired together to cheat and defraud the plaintiff out of his entire claim of £38,000, and out of his A and B shares of stock in the Trust Company, and are now, and have been for a long time, engaged and co-operating together for the purpose of preventing the plaintiff from realizing anything therefrom; that the president of the Investment Company is a large stockholder in the Trust Company, and has been so for a long time past; that he is now, and has been during all the time mentioned in the complaint, the chairman of the Investment Company, and at the same time has been one of the directors of the Trust Company, and so continues; that the Investment Company is a large stockholder in the Trust Company, owning and holding 360 of its A shares; that since the conveyance by the plaintiff to the Trust Company of the property described in that contract the said Trust Company has executed and issued certain obligations, known and styled by it as "debentures," amounting in all to about $550,000, a large number of which have been purchased, and are now owned, and have been owned for a long time, by the stockholders of the Trust Company; that a large number of them are now, and have been for a long time, owned by the Investment Company, and that about $85,000 of said debentures have been disposed of by the Investment Company to various parties, and guarantied by it prior to such disposal, and that the same are now secured by such guaranty, and that a large proportion of such debentures were so issued, negotiated, and held prior to the date of the said transfer by the plaintiff to the Investment Company of his A and B shares of the stock of the Trust Company, and of his claim and lien against that company; that for the purpose

of rendering the debentures held by the stockholders of the Trust Company and by the Investment Company more valuable, and for the further purpose of making good the contract of the Trust Company as evidenced by said debentures held by parties disinterested in either of the said companies, but guarantied by the Investment Company as aforesaid, and of relieving the Investment Company from liability as such guarantor, the defendant companies have conspired together, and are now conspiring, to defraud the plaintiff out of his entire interest in his claim against the Trust Company, and to forfeit, without legal right, and to appropriate to their own use, his A and B shares of the stock of the Trust Company, and, to that end, have denied all interest or claim of the plaintiff in and to any of the said property, and have refused in any manner to recognize his interest therein, or in any manner to endeavor to protect the same.

It is alleged that on the 31st day of March, 1891, the Trust Company made a statement of its affairs, and of its financial condition and profits for the time elapsing between January 1, 1890, and March 31, 1891, which showed that during that period the Trust Company had sold 936 acres of its lands, at an average price of $400 per acre, and 17.9 inches of water at an average price of $750 per inch, amounting in all to the sum of $386,000, which property, according to said statement, cost the Trust Company only $142,000, and that it likewise appeared therefrom that the expense of management and interest and dividends amounted to less than $40,000, leaving in the hands of the Trust Company, as net profit, over $250,000, out of which there became immediately due and payable to the plaintiff sufficient to satisfy his rights under the contract of December 13, 1889; that the Trust Company, after preparing and approving and submitting said statement of account at its annual meeting, colluded and conspired with the Investment Company to cheat and defraud the plaintiff, in pursuance of which purpose they have so changed and altered the said statement of accounts as to endeavor to make the same show that no profits of any kind were made during the aforesaid period which would become due to the plaintiff from the Trust Company; that each and every of the said collusive and fraudulent acts were performed while the Investment Company, as trustee of the plaintiff, was holding for collection the plaintiff's claim against the Trust Company, and while it was the duty of the Investment Company to require the Trust Company to pay the said profits, so determined and stated, upon the claim of the plaintiff; that by the aforesaid statement of accounts made and approved by the Trust Company on March 31, 1891, it was shown that there was in the hands of that company, profits to which the plaintiff was entitled under the contract of December 13, 1889, the sum of £11,364. 8s. 2d., which profits the plaintiff alleges were really far greater than thus stated, but that since the making of such statement the defendant companies, for the purpose of preventing the plaintiff from realizing anything upon his interests so transferred to the Investment Company as aforesaid, conspired to, and did, so alter and change the aforesaid state-

ment of accounts of the Trust Company as to cancel and erase from the books of that company, and from its statement, the said balance of £11,364. 8s. 2d., and have agreed that the same shall not be paid by the Trust Company, or collected by the Investment Company, and that the same shall not in any manner apply upon the claim of the plaintiff, notwithstanding the said amount has at all times since the said transfer by the plaintiff of his contract and shares of stock to the Investment Company been in the possession of the Trust Company, and due and payable to the plaintiff, and to the Investment Company as his trustee. It is alleged that the Investment Company has not in any manner proceeded, by foreclosure or otherwise, to subject the interest of the plaintiff in the contract and shares of stock transferred to it as security to the payment of its claim, but refuses absolutely to call upon or to require the Trust Company to pay any portion of the amount due the plaintiff, and refuses to join with the plaintiff in any suit or proceeding to collect the same, for which reason the plaintiff has been compelled to make the Investment Company a party defendant to this suit. It is alleged that the plaintiff, prior to the institution of the suit, demanded, in writing, of the Investment Company, that it proceed to collect the said sum due from the Trust Company to the plaintiff under the aforesaid contract of December 13, 1889, which demand was refused; that the defendants, and each of them, wrongfully deny that the plaintiff has any interest in the contract of December 13, 1889, or its proceeds, or to the said shares of stock; that the reasonable value of the said A and B shares, and of the plaintiff's interest, held by the Investment Company, is the sum of $1,000,000, all of which property was given and is held in trust by the Investment Company as collateral security as aforesaid.

The prayer is for an accounting between the plaintiff and defendants; that the amount due from the plaintiff to the Investment Company be ascertained and determined, and payment thereof provided for in such manner as shall be found equitable; that the amount due the plaintiff on account of said sum of £38,000 be ascertained and adjudged due as purchase money, in part, of the land and property referred to; that the plaintiff be decreed a vendor's lien on the said land for the amount found due to him, and that the interest of the Trust Company in such property be sold to pay the plaintiff's claim, and the shares of stock be adjudged to the plaintiff; and that the plaintiff have judgment for the sum of $750,000 damages against the defendant companies, and for such other and further relief as equity demands.

Upon the petition of the defendant companies the cause was removed from the state court to this court, and here, severing from their co-defendants sued by fictitious names, they answered jointly on the 27th day of May, 1895. By their answer they allege that the Trust Company has the absolute, fee-simple title to all of the property conveyed by the plaintiff's deed to it, except such portions as have been since sold by the Trust Company to bona fide purchasers, and deny that upon any portion of the property there exists, or ever has existed, any vendor's or other lien in favor of the plain-

tiff. They deny that the complaint correctly sets forth the terms or conditions of the contract of December 13, 1889, and allege that the terms, conditions, provisions, and stipulations under which the £38,000 and three-fifths of the profits were to be paid to the plaintiff, and the A and B shares issued to him, were as follows, and not otherwise:

"Third. The consideration for such transfer and assurance shall be: (1) Payment on or before the said 25th day of January next by the Trust Company to the vendor, or his nominee or nominees, of the sum of 168,000 pounds upon the said lands, canal, water rights, and property being effectually vested in the Trust Company, or its nominee or nominees, free from incumbrances; a good title having been previously shown thereto, to the satisfaction of the American and English legal advisers of the Trust Company: provided, always, that if a less sum than 160,000 pounds shall, as on the date of these presents, prove to be charged on the said premises by way of mortgage, or of lien for unpaid purchase money, or under a contract for purchase, including interest, then the difference between the sums so charged and the sum of 160,000 pounds shall be deducted from the said sum of 168,000 pounds so payable as aforesaid, and shall be added to, and shall be paid in the same manner as, the sum of 38,000 pounds payable to the vendor as hereinafter provided. (2) The allotment to the said Wilson Crewdson, as nominee of the vendor, of 100 B shares, of one pound each, numbered consecutively from one to one hundred, and the allotment to said Wilson Crewdson and to Theodore Waterhouse, of New Court, Lincoln's Inn, as nominees of the vendor, of 900 B shares, of one pound each, numbered consecutively from 101 to 1,000; all such shares to be credited as fully paid up, and registered accordingly, and to be held respectively by the said Wilson Crewdson and Theodore Waterhouse in manner hereinafter mentioned. (3) The reservation of 800 A shares for allotment to the vendor, and to be taken when issued in satisfaction, pro tanto, of the payment referred to in the next paragraph: provided, always, that the directors of the Trust Company shall be at liberty at any time to require the vendor to take up the same shares, or any portion thereof, and to pay up thereupon as much capital as shall for the time being be called upon the A shares then already issued, and to retain and apply on account of such shares any moneys which would otherwise be payable to the vendor under subsection 4 of this clause. (4) The payment of the further sum of 38,000 pounds and interest in the manner and upon the terms and conditions hereinafter mentioned, that is to say: (a) The said sum of 38,000 pounds, and any additions thereto as above mentioned, or so much thereof as shall for the time being remain unpaid, shall carry interest at the rate of six per cent. per annum from the 1st day of January, 1890. Such interest shall be credited to the vendor pari passu with the payment of the cumulative six per cent. dividend on the A shares. And, when and so soon as any such interest shall be credited to the vendor, it shall carry compound interest at the rate of 6 per cent. per annum, with yearly rests, until it shall be paid or satisfied. (b) At the end of each year after payment of all current and management expenses, and interest on borrowed money, and dividends (including arrears, if any, of cumulative dividends) at the rate of 6 per cent. on the capital for the time being paid up on the A shares, the surplus profits of the year shall be paid to the vendor, in or towards the liquidation of the said sum of 38,000 pounds and any additions as aforesaid, and interest thereon as aforesaid, until the same shall be fully paid and satisfied. (c) The vendor will at any time, and from time to time, upon receiving notice from the company, take up the whole or any part of the said 800 A shares, as the company may require, and shall forthwith pay up upon them as much as shall then be called up upon each of the other A shares then already issued, and any of such shares not taken up and paid for by the vendor within sixty days from the sending of such notice may be issued and allotted by the company in such manner and to such person as they think fit. (d) The directors shall have power at any time, and from time to time, to satisfy the whole or any part of the said sum of 38,000 pounds, and any additions thereto as aforesaid, and interest, in the first place, by issuing to the vendor, at par

value, A shares of the company, so far as there shall be any such unissued, and upon each of such shares so much capital shall be deemed to be paid up as shall be then paid or called up upon any of the A shares then already issued; and, in the second place, so far as there shall not be any A shares of the company unissued, by payments in cash. (e) On any sale of the company's undertaking, or on a winding up after paying all debts, and returning the amount paid up on the A shares, with all dividends due upon the same, any balance then unpaid of the said sum of 38,000 pounds, and any addition and interest as aforesaid, shall be a first charge on the surplus assets, if any."

The answer denies that no greater sum than £2,000 has been paid to the plaintiff upon said £38,000, but avers that in or about the month of August, 1891, the Trust Company paid to the plaintiff, under the conditions and provisions of the agreement of December 13, 1889, £2,115.16 on account of the principal, and £2,884.4 on account of interest. The answer denies that anything was due the plaintiff under the contract at the time of the commencement of the suit, or has since become due. It denies all of the allegations of the complaint in respect to collusion and fraud between the defendant companies, denies that the president of the Investment Company is, or has ever been, in his own right, a holder of shares of the Trust Company, and avers that the shares held by him therein are and were for the benefit of the Investment Company, for which reason only he became a director of the Trust Company. With respect to the statement of accounts alleged in the complaint, the answer alleges that it was not made until the month of July, 1891, and was not submitted to the Trust Company until August 5th of that year, and it denies that it properly appeared from that statement that any amount of profit had been made by the Trust Company during the period referred to in the complaint. The answer admits that it did appear from that statement that 936 acres of the company's lands had been sold, at an average price of $400 per acre, and 17.9 inches of water, at an average price of $750 per inch; but it alleges that, though those sales had been made, and by said account an apparent profit of £18,489. 1s. 3d. was shown, the truth is that nearly all of such sales had been made upon credit, and that at that time but small payments had been made thereon, and that from that date to this but small amounts, in the aggregate, have been collected thereon; that, within eight days after the presentation of the statement of accounts to the shareholders of the Trust Company, its directors discovered that the report was incorrect; that no profits over and above the expense of management, interest, accumulated dividends, and payments allowed by the agreement of December 13, 1889, to be made before any application of surplus profits to the £38,000 to be paid to the plaintiff, had in fact been realized, and that no such surplus profits existed on March 31, 1891, or have since existed, and that the Trust Company did not have on March 31, 1891, the sum of $250,000, or any other sum, in net profits; and that no sum of money at the commencement of this suit was due or payable, or is now due or payable, to the plaintiff, or to any other person, under the contract of December 13, 1889, on account of said £38,000, or interest thereon. The answer alleges that the directors of the Trust Company

promptly issued a supplemental report to the shareholders of the company, correcting the account prepared in July, 1891, and so submitted to the shareholders in August of that year, and that such correction was true, and made in good faith, and for no other purpose than to truly and properly present the exact facts in relation to the accounts of the Trust Company, all of which facts were known to the plaintiff. The defendant companies, by their answer, deny that the plaintiff has any interest in the contract or shares of stock, or in the properties therein described, transferred by him to the Investment Company, and allege that after his said assignment, and in the month of June, 1893, the plaintiff, for valuable consideration, assigned and granted to the Investment Company all his right, title, and interest in and to the said contract and shares, and the properties therein described, to the Investment Company, since which time he has had no interest whatever therein. The answer of the defendant companies further alleges that in and by a supplemental written agreement to that of December 13, 1889, to wit, an agreement entered into on the 18th day of December, 1889, between the plaintiff, Crewdson, and the Trust Company, the Trust Company was subrogated to all the rights of Crewdson under the contract of December 13, 1889, and Crewdson discharged from all liability thereunder, except as to the last stipulation in clause 20 thereof. The answer also pleads in defense of the suit the statute of limitations of the state of California, and further avers that in September, 1891, the Trust Company demanded of the plaintiff that he take up the said 800 A shares reserved for him by the agreement of December 13, 1889, and pay for the same as therein provided, which the plaintiff refused and neglected to do. The answer also avers that the payment of £38,000 and interest to the plaintiff provided for by the contract of December 13, 1889, was made contingent upon surplus profits arising to the Trust Company from sales by it of the property conveyed to it by the plaintiff, untrammeled and unaffected by any alleged claims of his upon those properties, by reason of which the plaintiff waived all vendor's or other liens thereon, and, further, that by his alleged vendor's lien he has further violated the terms and conditions of the contract of December 13, 1889. Other particulars are specified, in which the answer alleges the plaintiff waived all liens upon the properties conveyed by him to the Trust Company, and in which he is alleged to have failed to comply with his part of the contract of December 13, 1889. The answer avers full compliance upon the part of the Trust Company with its part of the contract, and specifically denies that it has realized any profits properly payable to the plaintiff thereunder, other than the payments alleged to have been made. It further avers that:

"If, under all the facts, it shall be found by final ultimate judgment (or affirmance thereof on appeal) herein that any sum is due and payable on account of the said balance of said £38,000 and interest from said Riverside Trust Company, Limited, the same should be decreed to be payable in said A shares, according to subsection 3 of paragraph 3, and subdivision d of subsection 4 of said paragraph 3 of said Exhibit A, for that and this defendant the Riverside Trust Company, Limited, hereby elects to so pay such sum,

if any such sum shall by such final judgment or affirmance thereof herein be found so due and payable, and in such case, but only in such case, prays that the same be so made payable, for that under said Exhibit A it has the right of such election and option."

On December 20, 1897, the complainant filed herein a petition, referring to, and making part thereof, the amended bill of complaint, and the answer of the defendant companies, with the exhibits annexed thereto, and in which it is, among other things, alleged that by stipulation of the respective parties to the suit, and under orders of this court based upon such stipulation, the time for taking the testimony in the cause has been extended from time to time; that, long prior to the filing of the said bill of complaint by the plaintiff, the defendant companies, and each of them, denied to the plaintiff that he had any right, title, interest, or equity of redemption whatsoever in or to said A and B shares of stock, or any thereof, or in or to the said contract for the sum of £38,000, each and every of which claims on the part of the defendant companies, the petitioner alleges, were wrongful and false; that at no time had the plaintiff surrendered, or been in any manner divested by any proceeding or agreement of his interest in the A and B shares of stock, or any thereof, or of his interest, rights, and equities under and by virtue of the contract of December 13, 1889; that the plaintiff never at any time subsequent to his mortgage to the Investment Company assigned or transferred to that company his equity of redemption, or any further right, title, or interest in or to the A and B shares of stock, or in or under the contract of December 13, 1889; that, by reason of the pleadings of the respective parties in this cause, all the matters of accounting, rights, equities, and interests between the plaintiff and the defendant companies under and by virtue of the contracts of December 13, 1889, and September 23, 1891, were in litigation and pending, with all of said parties personally in court, for adjudication, on the 21st day of July, 1897, and have ever since continued to be pending in this court; that during the summer of 1897 the petitioner had business in the city of London, England, and that while temporarily there, to wit, in July, 1897, the defendant Investment Company caused to be filed in the high court of justice, chancery division, before Justice North, a "statement of claim," as designated by the practice in that court, against this petitioner, on which he caused to be issued on the 16th day of July, 1897, a writ of summons of said court, directed to this petitioner, requiring and commanding him that within eight days after the service of that writ, inclusive of the day of said service, he cause to be entered in that proceeding his appearance; that the petitioner, upon service of the said writ, employed, for the purpose of preventing default against him, Messrs. Lyne & Holman, of the city of London, as his solicitors, and that afterwards, to wit, on the 4th day of August, 1897, there was delivered, pursuant to the practice of that court, to the petitioner's said solicitors, the statement of plaintiffs' claim, as made and filed in the said high court of justice; that subsequently the said statement of claim, as to the third and sixth

86 F.—63

paragraphs, was amended, and that the said claim, as amended, was delivered to the petitioner's solicitors on the 20th day of August, 1897,—copies of each of which statements of claim, together with a copy of the said summons, are annexed to, and made a part of, the petition. The petition further alleges that the said high court of justice is a court of record in the city of London, having chancery jurisdiction; that said statement of claim so filed in said court contains the allegations of the claim of the Investment Company against the petitioner, and sets out in detail an alleged cause of action against the petitioner herein in favor of the Investment Company, and that by the rules of practice and proceedings in said high court of justice the petitioner herein is required, pursuant to the said summons, to answer the same, and to submit to an adjudication of the matters and things set out and claimed in said statement of claim, the adjudication of which is within the jurisdiction of the said high court of justice. The petition alleges that each and every of the issues involved in said statement of claim is wholly with reference to the said A and B shares of stock in controversy in this suit between the petitioner herein, as complainant, and the defendant companies, and with reference to the said contracts of December 13, 1889, and September 23, 1891; that each and every of the matters and things presented in said statement of claim so filed in the high court of justice are involved, pending, and being litigated, and were involved, pending, and being litigated, in this court, long prior to the commencement of said proceeding in said high court of justice of England, and that this court then had and still has full and complete jurisdiction of all said matters and issues, and of the parties interested in said contracts, and in said A and B shares of stock, and is fully competent to administer and determine each and every of said matters between the petitioner herein and the defendant companies in this suit; that Frederick Priestman, Isaac Smith, and John Henry Wade are made parties plaintiff in said proceeding in said high court of justice of England, as well as the Investment Company; that said Priestman, Smith, and Wade have no interest whatever in the subject-matter of said litigation, except that they are alleged in said statement of claim to be trustees for the Investment Company of 600 of the A shares of stock of the petitioner herein, and have no personal interest in that action, or in the result thereof; that ever since about June, 1893, the defendant companies, and each of them, have claimed and alleged that the petitioner herein has no interest whatever in the said contract of December 13, 1889, or in said A and B shares of stock, and in their answer filed in this suit so alleged and declared; that since about June, 1893, the Trust Company has declined to give to the petitioner herein any information in regard to the business and state of accounts of said corporation due to a stockholder and party interested therein, and has declined to permit the petitioner to examine its books of account, or to advise himself in any manner in respect to its affairs, and has given as a reason for such refusal that this plaintiff has no longer any interest in said contract of December 13, 1889, or in

said A and B shares, or any of them, by reason of which denials and assertions the petitioner was compelled to, and did, begin the present suit. The petition alleges that the business of the Trust Company is almost entirely carried on and prosecuted in the county of Riverside, state of California, and consists of the business of selling real estate, developing water, improving property, planting and caring for and cultivating orange orchards, all of which is done and carried on upon and in connection with the lands conveyed by the petitioner to the Trust Company under and pursuant to the provisions of the contract of December 13, 1889; that the office of the Trust Company, through which such business is conducted, is, and has been at all times since March 31, 1890, located in the city of Riverside, where its books of account have been kept, and that all the data necessary for fully stating the accounts between the respective parties are in that office, and that the witnesses by whom the petitioner, as plaintiff in this suit, will be required to make proof of the state of accounts, and establish the values of the properties of the Trust Company, and by whom it will be necessary to fix such values for the purpose of stating the accounts, and of estimating the profits as between the complainant and the Trust Company, and of stating and determining the accounts between the complainant and the Investment Company, reside at or in the vicinity of Riverside, Cal., and not within the jurisdiction of the said high court of justice of England; that, by reason of the wrongful acts of the defendant companies as set out in his bill of complaint, and by reason of the long-continued and persistent denials of all equity and interest on his part in the contract of December 13, 1889, and in the said A and B shares of stock, the petitioner's credit has been destroyed, his ability to provide funds for the prosecution of his rights has been greatly impaired, and that while he can continue this litigation where the witnesses reside, and where the property and interests and accounts are located and kept, he is unable to make such defense as is necessary in the English court in order to preserve his equities and rights; that, by reason of the facts alleged, said proceeding so commenced in the said high court of justice of England is vexatious, and wholly unnecessary to a full and complete adjudication of the rights of the parties, and will be attended by great and unnecessary expense, which the petitioner is unable to meet; that, unless the defendant Investment Company is restrained and enjoined from proceeding in said action, the said suit will be prosecuted to decree in the said high court of justice against the petitioner while the petitioner is litigating the same matters in this prior suit.

Upon the filing of the petition the court entered an order directing the defendant Investment Company to show cause at a specified time why it should not be enjoined, pending the determination of this suit, from prosecuting the suit so commenced by it in the high court of justice of England, and in the meantime restraining the said Investment Company from so doing. In response to the order to show cause there was filed on behalf of the defendant Investment Company an affidavit of its solicitor, in which it is, among other things, averred

that this suit does not involve the issue, or any of the issues, involved in that commenced in the high court of justice of England; that that suit was for the foreclosure of the mortgage executed by Gage to the Investment Company, all of which mortgaged property was at the time of the execution of the mortgage, and since has been, located in England, and is not now, and never has been, within the jurisdiction of this court; that the parties in the two suits are different; and that by his bill of complaint in this suit Gage does not seek, and never has sought, to have either the said A and B shares, or any of the rights conferred upon him by the agreement of December 13, 1889, and by him mortgaged to the Investment Company, sold in order to pay that mortgage. The affidavit filed on behalf of the Investment Company also puts in issue the averments of the petition to the effect that the plaintiff, Gage, has never surrendered his equity of redemption in the mortgaged property, and sets out certain correspondence, by letter and wire, between Gage and the Investment Company, from which it is claimed that such surrender is shown. In respect to the correspondence, it is sufficient now to say that, while it shows great leniency on the part of the creditor company towards its debtor, Gage, and repeated failures on his part to make good his many promises of payment, the communications fall far short of showing a consummated agreement by which Gage surrendered to the Investment Company his equities in the mortgaged property. And, as has been seen, the suit in the high court of justice of England was brought for the purpose of foreclosing the mortgage executed by Gage to the Investment Company, the commencement and prosecution of which presupposes the existence in the mortgagor of equities, the termination of which was the object of that suit. It is urged on behalf of the Investment Company that the same purpose is not within the scope of the pleadings filed in this suit. It is true that, in his bill of complaint, Gage does not ask that the A and B shares of the stock of the Trust Company, and the other rights acquired by him under the contract of December 13, 1889, and mortgaged by him to the Investment Company, be sold to pay his indebtedness to that company; but he does set up the mortgage to the Investment Company, as well as his contract with the Trust Company, and does allege that indebtedness, as well as his rights under the contract of December 13, 1889, and asks for an accounting with both the Trust Company and the Investment Company, and that his indebtedness to the Investment Company be ascertained and determined, and payment thereof provided for by the decree of this court, and for such other decree as equity demands. The contract of mortgage or pledge between the complainant, Gage, and the defendant Investment Company, contains, among other provisions, the following:

"In consideration of the premises, the mortgagor doth hereby irrevocably empower, during the continuance of this security, the company, and their assigns or officers or agents, to be the attorney or attorneys of the mortgagor, in his name or otherwise to demand, sue for, recover, receive, and give receipts for all or any moneys becoming due or receivable in respect of any of the mortgaged premises, and to execute and do all such transfers and things as are hereby covenanted to be executed and done by the mortgagor, and to give effectual discharges to the Riverside Trust Company for all moneys or shares

payable or redeliverable to the mortgagor under the terms of the said agreement; and it is hereby agreed and declared that it shall be lawful for the company to settle, arrange, compromise, and submit to arbitration any accounts, claims, questions, or disputes whatsoever which may arise with the Riverside Trust Company in connection with the said agreement, or any person or persons, company or companies whatsoever in relation to the premises, and to execute releases and other discharges in relation thereto, and to commence, prosecute, defend, compromise, submit to arbitration, and abandon any actions, suits, or proceedings whatsoever in any wise relating thereto, and, for or in relation to any of the purposes aforesaid, to execute and do all such assurances, contracts, instruments, and things as may be or appear necessary or proper, with full power to use the name of the mortgagor for the purpose of exercising any of the powers aforesaid or otherwise in relation to the premises."

Certainly, in view of this stipulation, the claim on the part of the Investment Company, that it was under no obligation to demand, and, if necessary, sue for, whatever, if any, moneys became due from the Trust Company to Gage, cannot be sustained. The bill in this suit alleges, as has been seen, that prior to its institution more money had become due to Gage from the Trust Company under the contract of December 13, 1889, than is sufficient to discharge his indebtedness to the Investment Company. Issue was taken by both the Trust Company and Investment Company upon that allegation, and is one of the issues to be tried in this suit. Conceding that the proof, when taken, may show the facts to be with the defendant companies in respect to that matter, the Investment Company's mortgage remains alleged in the amended bill and admitted in the answer, and the complainant's indebtedness to the Investment Company remains alleged in the amended bill and admitted in the answer (although issue is therein taken as to its exact amount), as well as the prayer on the part of the complainant that the complainant's said indebtedness to the Investment Company be ascertained and determined, and payment thereof provided for by the decree of this court, and for such further decree as equity demands. Under these allegations and this prayer, I see no difficulty in the way of a decree being entered in this suit, if the facts should justify it, fixing and determining the amount of the indebtedness from Gage to the Investment Company, and providing for its payment by the sale of the property mortgaged by him as security for such payment. In view of the claim of the Investment Company, as shown by the averments not only of the amended bill in this suit, but of the answer of both the Trust Company and the Investment Company as well, to the effect that long prior to the bringing of this suit, and necessarily long prior to the bringing of the subsequent suit in the high court of justice of England, the Investment Company denied any right or equity on the part of Gage in or to any of the mortgaged property, and asserted that he had theretofore surrendered and conveyed to it all of his rights and equities therein, it is not surprising that neither of the pleadings in this suit in terms asked for the foreclosure of the mortgage from Gage to the Investment Company. The complainant could hardly be expected to do more, after setting up his alleged rights as against the claim of the Investment Company, than to ask that his indebtedness under the mortgage, which he alleged and set out, be ascertained and determined, and payment thereof provided for, and the securities be adjudged to be returned to him. And as

the Investment Company admitted, as well as asserted, by its answer to the bill, that the complainant, prior to the institution of his suit, had surrendered and conveyed to the Investment Company all of his rights and equities in the mortgaged property, the assertion by it of a right to foreclose that mortgage could hardly be expected in the same pleading. If, however, the Investment Company had in this suit assumed the position taken by it in bringing the subsequent suit in the high court of justice of England, that there were subsisting equities on the part of Gage in the mortgaged property which it desired to cut off and end by a foreclosure, no reason is perceived why it could not have done so in this suit by a cross bill; nor any reason why it may not yet do so. But, as already stated, I have no doubt that without such a cross bill the scope of the pleadings in the present suit is sufficient to warrant the entry of a decree for the foreclosure of that mortgage, in the event the proof be such as to justify it, even though it be also shown that the complainant has no cause of action against the Trust Company. It is not important that the shares of stock, and the written contract by which the complainant mortgaged or pledged them, together with his rights and interests in and under the contract of December 13, 1889, to the Investment Company, are, and ever since the execution of the mortgage have been, in England. Those papers are but evidences of rights in and growing out of the property that is situated, and always has been situated, in California, and within the jurisdiction of this court. Besides:

"Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitæ, which he could do voluntarily to give full effect to the decree against him. Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree in personam according to those equities, and enforce obedience to their decrees by process in personam." Phelps v. McDonald, 99 U. S. 298, 308; Cole v. Cunningham, 133 U. S. 119, 10 Sup. Ct. 269.

The suggestion that the granting of the injunction asked for may enable the statute of limitations to run against the Investment Company's rights under the mortgage is without force, for several reasons. In the first place, it is not now sought to compel the defendant Investment Company to dismiss its suit in the high court of justice of England, but only to enjoin it from prosecuting that suit during the pendency of this prior suit. In the second place, as it is a fact conceded by the pleadings on all sides that the pledged or mortgaged property is held by the Investment Company as security for money loaned by it to the complainant, that company could not be compelled to surrender the security without full payment of its debt, even though the statute of limitations had fully run in the complainant's favor. Whitmore v. Savings Union, 50 Cal. 150; Grant v. Burr, 54 Cal. 300; Spect v. Spect, 88 Cal. 437, 26 Pac. 203. In the third place, the complainant would be estopped by the allegations and prayer of his bill of complaint from setting up the statute of limitations in bar of his admitted and alleged indebtedness. Railroad Co. v. Howard, 13 How. 335, 336; Bowen v. Stribling (S. C.) 24 S. E. 986; 2 Herm. Estop. & Res Adj. 912. The power of a court of chancery, in a proper case, to restrain

persons within its jurisdiction from prosecuting suits in other courts, foreign or domestic, is well settled.   In Lord Portarlington v. Soulby, 3 Mylne & K. 104, 106, Lord Chancellor Brougham reviews the history of the jurisdiction to restrain parties from commencing or prosecuting actions in foreign countries, and concludes:

"Nothing can be more unfounded than the doubts of the jurisdiction.   That is grounded, like all other jurisdiction of the court, not upon any pretension to the exercise of judicial and administrative rights abroad, but on the circumstance of the person of the party on whom this order is made being within the power of the court."   Earl of Oxford's Case, 1 Ch. R. 1, 2 White & T. Lead. Cas. Eq. 1316.

Mr. Justice Story states the principle thus:

"But, although the courts of one country have no authority to stay proceedings in the courts of another, they have an undoubted authority to control all persons and things within their own territorial limits.   When, therefore, both parties to a suit in a foreign country are resident within the territorial limits of another country, the courts of equity in the latter may act in personam upon those parties, and direct them, by injunction, to proceed no further in such suit. In such a case these courts act upon acknowledged principles of public law in regard to jurisdiction.   They do not pretend to direct or control the foreign court, but, without regard to the situation of the subject-matter of the dispute, they consider the equities between the parties, and decree in personam according to those equities, and enforce obedience to their decrees by process in personam. * * * It is now held that, whenever the parties are resident within a country, the courts of that country have full authority to act upon them personally, with respect to the subject of suits in a foreign country, as the ends of justice may require, and, with that view, to order them to take, or omit to take, any steps and proceedings in any other court of justice, whether in the same country, or in any foreign country."   Story, Eq. Jur. §§ 899, 900.

See, also, Dehon v. Foster, 4 Allen, 550; Massie v. Watts, 6 Cranch, 158; Cole v. Cunningham. 133 U. S. 118, 10 Sup. Ct. 269; Phelps v. McDonald, 99 U. S. 298; Beach, Mod. Eq. Prac. §§ 763, 764.

The proposition that the court which first acquires jurisdiction of a cause and of the parties thereto will hold and maintain it, in order to settle and end the controversy, does not admit of question.   From the views expressed, it results that the injunction asked for should be granted, and it is so ordered.